**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**CONNIE DEHART**, individually and on behalf of all others similarly situated,

Plaintiff,

v.

**INTERIM HEALTHCARE INC.**, a Florida corporation,

Defendant.

**Case No. ___________________**

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT

Plaintiff, Connie DeHart ("Plaintiff"), individually and on behalf of the classes defined below, brings this Class Action Complaint against Defendant Interim HealthCare Inc. ("Interim" or "Defendant"). Plaintiff alleges the following based on personal knowledge as to her own acts and experiences and, as to all other matters, on information and belief after investigation by counsel.

## NATURE OF THE ACTION

1. This is a class action arising from a data-security failure at the headquarters of one of the nation's largest home-healthcare, hospice, personal-care, and medical-staffing networks. Interim represents that its network includes more than 300 locations, cares for approximately 190,000 patients each year, employs approximately 43,000 healthcare professionals, and operates in 44 states.[1]

2. Upon information and belief, Interim designed and controls the network

---

[1] Interim HealthCare, Home Healthcare Agency & Medical Staffing, https://www.interimhealthcare.com/ (last visited Sep. 2, 2026).

technology through which franchise operations share information with its headquarters. Interim requires approved operational systems, including electronic medical-record systems; provides cloud infrastructure, cybersecurity, network data, email, intranet, and IT support; collects home-health and hospice data for national reports; and reserves unrestricted access to information collected or compiled in those systems.[2]

3. In August 2026, two criminal data-extortion enterprises—Genesis and Anubis—separately claimed on their data-leak sites that they had hacked Interim HealthCare and stolen data from computer systems associated with the domain interimhealthcare.com. Anubis later posted a separate entry identifying "Interim HealthCare [Head office]" and claimed that it had stolen 530 gigabytes of data comprising 335,093 files relating to "Hospice services."[3]

4. Based on the detailed and consistent postings by Genesis and Anubis, Plaintiff alleges on information and belief that unauthorized persons gained access to computer systems used or controlled by Interim and stole files containing patient and consumer information (the "Data Breach").

5. Plaintiff received healthcare services through an Interim provider. In obtaining and paying for those services, Plaintiff entrusted Private Information to the Interim network. Because Interim required approved operational systems, provided centralized cloud and network infrastructure, collected home-health and hospice information for national reporting, and retained unrestricted access to information collected. Plaintiff alleges on information and belief that her

---

[2] Interim HealthCare Inc., 2025 Franchise Disclosure Document, at 33, 41–43, 99–103, https://carezano.com/documents/interim-healthcare-fdd-2025.pdf (last visited Sep. 2, 2026).

[3] *see* https://socradar.io/free-tools/ransomware-intelligence/victims/interim-healthcare-genesis-233326cd (last visited Sep. 2, 2026); https://socradar.io/free-tools/ransomware-intelligence/victims/interim-healthcare-anubis-de2f9b81 (last visited Sep. 2, 2026); https://darkweb.thugs.red/site/917-anubis-om6q4a6c (last visited Sep. 2, 2026); https://socradar.io/free-tools/ransomware-intelligence/victims/interim-healthcare-head-office-anubis-efd71c73 (last visited Sep. 2, 2026).

records were maintained in, transmitted through, reported from, or accessible through the compromised systems and were among the files acquired in the Data Breach.

6. Plaintiff seeks damages and equitable relief for herself and a Nationwide Class, , arising from Interim's failure to secure the Private Information it required, accessed, and used.

**PARTIES**

7. Plaintiff is a natural person and citizen of Kansas. She received healthcare services through an Interim-branded provider.

8. To receive those services, Plaintiff provided and allowed the collection of information concerning her identity, contact information, health, treatment, insurance, billing, and payment. On information and belief, the file maintained about Plaintiff also included her Social Security number, -account information, insurance identifiers, and account credentials. Collectively, this information is referred to as "Private Information" and includes personally identifiable information ("PII") and protected health information ("PHI").

9. Defendant Interim HealthCare Inc. is an active Florida for-profit corporation with its principal place of business and headquarters at 1551 Sawgrass Corporate Parkway, Suite 230, Sunrise, Florida 33323.

10. Interim owns and administers the Interim HealthCare brand and national network. Interim exercises centralized control over network technology, approved software, electronic records access, and cybersecurity.

**JURISDICTION AND VENUE**

11. This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The proposed Nationwide Class contains at least 100 members; Plaintiff is a Georgia citizen and Interim is a Florida citizen; and, aggregating the claims of all Class

members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

12. Interim is a citizen of Florida because it is incorporated in Florida and maintains its principal place of business and corporate headquarters in Sunrise, Florida. 28 U.S.C. § 1332(c)(1).

13. This Court has personal jurisdiction over Interim because Interim is at home in Florida, maintains its headquarters in this District, directed the relevant data-governance and security conduct from this District, and the Data Breach expressly identified its headquarters.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Interim resides in this District and a substantial part of the events and omissions giving rise to the claims—including the design, control, and security of headquarters technology and data systems—occurred in this District.

## FACTUAL ALLEGATIONS

### A. Interim's National Network and Centralized Data Access

15. Interim's business depends on collecting and using highly sensitive patient, employee, caregiver, billing, and insurance information across a nationwide network. Home-health and hospice records reveal medical diagnoses, treatments, medications, functional limitations, caregiver schedules, home addresses, insurance information, claims, and other intimate facts.

16. Interim's 2025 Franchise Disclosure Document states that franchisees pay a monthly technology fee for Interim email; access to Interim systems, including its proprietary intranet and network data; IT and help-desk support; cloud infrastructure; cybersecurity; and technology used to obtain home-health and hospice data for network reports.[4]

---

[4] 2025 FDD at 41–43, 99–103.

17. The same disclosure states that franchisees must use approved web-based systems to manage operational functions such as client and caregiver management, scheduling, telephone, payroll, and billing, and must use assigned Interim email addresses. Approved systems may include designated electronic medical-record systems, applicant-management systems, and learning-management systems.

18. Interim expressly reserves "independent, unlimited access" to information generated through approved software systems. Its franchise agreement likewise gives Interim the "unrestricted right to independently access all information collected or compiled" through those systems. Interim also reserves the right to inspect and copy electronically maintained franchise records.

19. Interim approved systems used to process patient records, provided cybersecurity and cloud infrastructure, obtained patient data, and retained patient data.

20. Interim’s Notice of Privacy Practices promises: "We are required by law to maintain the privacy and security of your protected health information" and "We will let you know promptly if a breach occurs that may have compromised the privacy or security of your information."[5]

21. These representations and system disclosures confirm that safeguarding patient information is an integral part of Interim’s healthcare services and that Interim assumed responsibility for the security and confidentiality of Private Information accessible through its systems.

**B. Plaintiff Entrusted Private Information to the Interim Network**

22. Plaintiff received healthcare services through a provider doing business under the

---

[5] Interim HealthCare, HIPAA Privacy Practices, https://www.interimhealthcare.com/hipaa-privacy-practices (last visited Sep. 2, 2026).

Interim HealthCare name. She and her insurer provided monetary consideration for those services.

23. Private Information was required to identify Plaintiff, coordinate care, document services, submit and adjudicate claims, receive payment, comply with healthcare laws, and maintain a longitudinal record. Plaintiff could not receive the services without allowing the collection and use of that information.

24. Interim obtained a direct financial benefit from transactions conducted within its network through royalties and technology fees. The technology fee expressly funded cybersecurity and the national systems through which Interim obtained network data.

25. Plaintiff reasonably understood that a portion of the consideration paid for healthcare services would be used to provide reasonable privacy and security. That understanding was reinforced by Interim's public privacy statements and Notice of Privacy Practices.

26. On information and belief, Plaintiff's records were created, received, maintained, transmitted, reported, or made accessible through one or more approved systems to which Interim reserved unrestricted access.

27. Plaintiff did not consent to disclosure of her Private Information to Genesis, Anubis, their members or affiliates, dark-web users, or any other unauthorized person.

**C. The August 2026 Data Breach**

28. On or about August 10, 2026, threat-intelligence monitors recorded a Genesis ransomware claim against Interim.[6]

---

[6] SOCRadar, Interim HealthCare Ransomware Attack by Genesis, https://socradar.io/free-tools/ransomware-intelligence/victims/interim-healthcare-genesis-233326cd (last visited Sep. 2, 2026).

29. Genesis and Anubis are established data-extortion operations, not merely anonymous posters making isolated, unverifiable assertions. Cybersecurity researchers classify Genesis as a data-extortion group whose operating model consists of gaining unauthorized access, exfiltrating sensitive files, and publishing stolen data. Researchers further report that breach notifications from multiple Genesis-listed organizations have independently confirmed actual data theft, including the theft of patient medical records, Social Security numbers, and billing information.[7]

30. Genesis's history includes the breach of Stockton Cardiology Medical Group. Stockton Cardiology officially acknowledged that an unauthorized person accessed and removed files used for patient care and that some of those files were subsequently publicly disclosed. Genesis identified Stockton Cardiology on its leak site as well and claimed possession of healthcare, personal, and financial data from the practice.[8]

31. On August 15, 2026, Anubis separately posted an entry titled "Interim HealthCare" and described the target as a "Home Healthcare Agency & Medical Staffing" organization.[9] On August 21, 2026, Anubis posted a more specific entry titled "Interim HealthCare [Head office]," used the domain interimhealthcare.com, and described the incident as a "Data breach at a major healthcare franchise headquarters." Captured text from Anubis's page identifies the headquarters dataset as "Hospice services / 530 GB / 335,093 files."[10] The precision of the claimed data volume and file count reflects knowledge obtainable from access to, acquisition of, or control over the dataset.

[7] https://www.halcyon.ai/threat-group/genesis (last visited Sep. 2, 2026).

[8] https://www.paubox.com/blog/stockton-cardiology-reveals-ransomware-breach-as-genesis-claims-645gb-stolen (last visited Sep. 2, 2026).

[9] RansomLook, Anubis, https://www.ransomlook.io/group/anubis (last visited Sep. 2, 2026).

[10] DarkWeb Monitor, Anubis, https://darkweb.thugs.red/site/917-anubis-om6q4a6c (last visited Sep. 2, 2026).

32. Anubis is an organized ransomware-as-a-service enterprise that couples data theft and extortion with file encryption and an optional destructive wiping capability.[11] Security researchers who investigated multiple Anubis intrusions in 2026 identified recurring use of VPN infrastructure, legitimate remote-monitoring tools, and legitimate binaries to blend malicious activity into victim environments.[12]

33. Anubis has also targeted healthcare information. Singing River Health System officially confirmed that an unauthorized party accessed files containing patient information—including Social Security numbers, bank-account information, insurance information, medications, and treatment and diagnostic information—affecting 53,888 individuals. Anubis likewise identified Singing River on its leak site to demonstrate possession of the stolen information.[13]

34. Upon information and belief, the Genesis and Anubis postings reflect successive access, the resale or sharing of access or data, or separate compromises within the Interim network.

35. On information and belief, Genesis and Anubis acquired Private Information from systems controlled by or accessible to Interim. The categories acquired include names, contact information, dates of birth, Social Security numbers or other identifiers, insurance and member identifiers, billing and claims information, medical diagnoses, treatment and service records,

---

[11] Trend Micro Research, Anubis: A Closer Look at an Emerging Ransomware with Built-in Wiper (June 13, 2025), https://www.trendmicro.com/en_us/research/25/f/anubis-a-closer-look-at-an-emerging-ransomware.html.

[12] Arctic Wolf Labs, The Tools and Techniques Behind Anubis Ransomware Attacks (June 30, 2026), https://arcticwolf.com/resources/blog/citrixbleed-2-to-cloudflared-the-tools-and-techniques-behind-anubis-ransomware-attacks/

[13] https://singingriverhealthsystem.com/2026/05/notice-of-data-security-incident/; https://www.comparitech.com/news/cybercriminals-take-credit-for-singing-river-health-system-data-breach/ (last visited Sep. 2, 2026).

caregiver and scheduling information, and credentials.

36. The public identification of Interim on criminal leak sites and the acquisition of Private Information by criminal actors are themselves disclosures to unauthorized persons. The actors obtained control over the information for the purpose of monetizing it through extortion, publication, sale, fraud, or further crime.

**D. Interim's Data-Security and Confidentiality Obligations**

37. Interim was required to use reasonable administrative, physical, and technical safeguards commensurate with the sensitivity and volume of the Private Information it collected, accessed, and used.

38. On information and belief, Interim was subject to HIPAA and its implementing regulations as a covered entity, business associate, or both, to the extent it created, received, maintained, or transmitted electronic PHI in performing healthcare and network functions.

39. The HIPAA Security Rule requires regulated entities to ensure the confidentiality, integrity, and availability of electronic PHI; protect against reasonably anticipated threats and unauthorized uses or disclosures; and maintain reasonable and appropriate administrative, physical, and technical safeguards.[14]

40. HIPAA's security-management standard requires policies and procedures to prevent, detect, contain, and correct security violations, beginning with an accurate and thorough assessment of risks and vulnerabilities to all electronic PHI. 45 C.F.R. § 164.308(a)(1).15

41. The Security Rule also requires access controls, audit controls, integrity controls,

---

[14] U.S. Department of Health & Human Services, Summary of the HIPAA Security Rule, https://www.hhs.gov/hipaa/for-professionals/security/laws-regulations/index.html (updated Aug. 7, 2026).

[15] U.S. Department of Health & Human Services, Guidance on Risk Analysis, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (updated Aug. 12, 2026).

person-or-entity authentication, and transmission security, together with workforce security and training, security-incident procedures, contingency planning, and appropriate business-associate arrangements. 45 C.F.R. §§ 164.308(a)(3), (5)–(7), (b), 164.312(a)–(e).

42. HHS has specifically explained that the Security Rule requires measures that can help prevent malware and ransomware, and policies and procedures that enable regulated entities to respond to and recover from a ransomware attack.[16]

43. The HIPAA Breach Notification Rule requires notice to affected individuals without unreasonable delay and no later than 60 days after discovery of a breach of unsecured PHI. 45 C.F.R. §§ 164.400–414. Interim promised even more directly that it would notify affected persons promptly.

44. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits unfair acts or practices in or affecting commerce. The FTC has repeatedly treated a business's failure to employ reasonable measures to protect sensitive consumer data as an unfair practice.

45. The FTC's authority to challenge unreasonable data-security practices under Section 5 is well established. See FTC v. Wyndham Worldwide Corp., 799 F.3d 236, 240, 257–59 (3d Cir. 2015).

46. The FTC's Protecting Personal Information guide instructs businesses to know what information they hold, keep only what they need, protect the information they retain, properly dispose of what they no longer need, and plan ahead for security incidents. It recommends access controls, secure authentication, encryption, network segmentation,

[16] U.S. Department of Health & Human Services, Fact Sheet: Ransomware and HIPAA, https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html (last reviewed Sept. 20, 2021).

monitoring for attempted intrusions and large data transfers, testing, and vendor oversight.[17]

47. The FTC's Start with Security guidance likewise emphasizes limiting access to sensitive data, requiring secure authentication, storing sensitive personal information securely, segmenting networks, monitoring activity, securing remote access, testing for common vulnerabilities, and verifying service-provider security.[18]

48. NIST Cybersecurity Framework 2.0 organizes reasonable cybersecurity outcomes into six concurrent functions—Govern, Identify, Protect, Detect, Respond, and Recover—and emphasizes that risk governance, asset and data identification, protective controls, continuous detection, tested incident response, and recovery capabilities operate together.[19]

49. CISA's #StopRansomware guidance calls for phishing-resistant multifactor authentication, timely patching, network segmentation, least-privilege access, monitoring, endpoint detection, incident-response planning, and offline encrypted backups that are regularly tested.[20]

50. The FTC's breach-response guidance calls for rapid containment, forensic review of logs and access, verification of the information compromised and persons affected,

---

[17] Federal Trade Commission, Protecting Personal Information: A Guide for Business, https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Sep. 2, 2026).

[18] Federal Trade Commission, Start with Security: A Guide for Business, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited Sep. 2, 2026).

[19] Cherilyn Pascoe, Stephen Quinn & Karen Scarfone, National Institute of Standards and Technology, The NIST Cybersecurity Framework (CSF) 2.0, NIST CSWP 29 (Feb. 26, 2024), https://doi.org/10.6028/NIST.CSWP.29.

[20] Cybersecurity & Infrastructure Security Agency, #StopRansomware Guide, https://www.cisa.gov/stopransomware/ransomware-guide (last visited Sep. 2, 2026).

preservation of evidence, correction of vulnerabilities, and appropriate notice.[21]

51. These statutes, regulations, frameworks, and publications reflect the minimum reasonable practices known throughout the healthcare and information-security industries well before August 2026.

**E. Interim Failed to Use Reasonable Security**

52. A reasonably secured environment would not have permitted criminal actors to acquire hundreds of gigabytes and hundreds of thousands of headquarters files, identify the company and its headquarters, and use the dataset as leverage on criminal leak sites.

53. On information and belief, the Data Breach resulted from one or more deficiencies within Interim's control, including failure to:

A. maintain a complete inventory of systems, data, accounts, connections, and vendors that created, received, maintained, transmitted, or accessed Private Information;

B. conduct accurate and thorough enterprise and system-specific risk analyses and timely remediate identified vulnerabilities;

C. enforce phishing-resistant multifactor authentication and least-privilege access for remote, privileged, cloud, email, vendor, and administrative accounts;

D. segment headquarters, franchise, email, cloud, reporting, backup, and electronic medical-record environments to prevent lateral movement and bulk acquisition;

E. encrypt Private Information at rest and in transit and segregate encryption keys from data and ordinary user credentials;

F. timely patch internet-facing systems, endpoints, VPN infrastructure, remote-

[21] Federal Trade Commission, Data Breach Response: A Guide for Business, https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business (last visited Sep. 2, 2026).

management tools, servers, applications, and dependencies;

G. deploy and properly configure endpoint detection, data-loss prevention, logging, alerting, and continuous monitoring capable of detecting credential misuse, unusual access, staging, compression, and large outbound transfers;

H. retain and review complete logs sufficient to identify affected systems, files, users, and dates;

I. control and audit service providers and approved software vendors with access to network Private Information;

J. maintain, test, and execute an incident-response plan capable of rapid isolation, containment, eradication, forensic preservation, and notification; and

K. minimize, delete, deidentify, or archive Private Information that was no longer reasonably necessary for care, billing, legal retention, or network operations.

54. Interim knew or should have known that ransomware and data-extortion actors target healthcare organizations because health records are sensitive, durable, difficult to replace, useful for fraud and extortion, and essential to operations.

55. Interim also knew that its national system architecture created concentration risk: headquarters' unlimited access, national reporting, shared email, cloud infrastructure, approved software, and network data could expose sensitive information originating in multiple locations if a central account or system was compromised.

56. The occurrence and scale of the Data Breach demonstrate that Interim's safeguards did not satisfy its own representations, the duties it assumed, or reasonable industry standards.

**F. The Value of the Stolen Private Information and the Substantial Risk of Fraud, Medical-Identity Theft, and Other Misuse**

57. The Data Breach caused an immediate loss of privacy and confidentiality. Criminal actors obtained control of information that Plaintiff and Class members disclosed only for healthcare, payment, employment, or related legitimate purposes.

58. Private Information has economic value to both its owners and criminals. It can be used for account takeover, identity theft, synthetic-identity fraud, tax fraud, insurance fraud, medical-identity theft, targeted phishing, credential attacks, extortion, and other crimes.

59. Experian reports that personal information sells on dark-web markets for average prices ranging from approximately $1 to more than $4,000, depending on the type and completeness of the data. Reported prices include $10 to $240 for credit-card details, approximately $150 for a driver's license, and $30 to $4,255 for bank-account details. Experian further explains that information placed on the dark web cannot be fully removed because it is copied, redistributed, and stored across anonymous platforms.[22]

60. Medical and identifying information is particularly dangerous because it is durable and cannot simply be canceled and reissued like a payment card. Medical-identity theft can corrupt a victim's medical record, interfere with available care or insurance benefits, generate false claims and bills, damage credit, and cause treatment decisions to be made from inaccurate information.[23]

61. A Secure Technology Alliance publication, citing a 2010 Ponemon Institute

---

[22] Experian, Here's What Your Data Sells for on the Dark Web (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Sep. 2, 2026).

[23] Federal Trade Commission, What To Know About Medical Identity Theft, https://consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last visited Sep. 2, 2026); U.S. Department of Health & Human Services, Office of Inspector General, Medical Identity Theft, https://oig.hhs.gov/fraud/consumer-alerts/medical-identity-theft/.

study, reported that nearly 1.5 million Americans had experienced medical-identity theft at an estimated aggregate cost of $28.6 billion, or approximately $20,000 per victim. The publication also described the difficulty and potentially life-threatening consequences of correcting medical records corrupted by fraudulent healthcare events.[24]

62. The U.S. Government Accountability Office ("GAO") has recognized that breaches of electronic health information have caused identity theft, fraud, and disruption of healthcare services.[25]

63. GAO has also explained that stolen data may not be used until a year or more after a breach and that, once stolen data are sold or posted online, fraudulent use may continue for years. The absence of immediately detected misuse therefore does not eliminate future harm.[26]

64. Because Genesis and Anubis obtained or claimed the data for extortion and publication, and because their established operating models involve stealing, monetizing, and publishing victim data, the risk of misuse is substantial, foreseeable, immediate, and traceable to the Data Breach.

**G. Plaintiff and Class Members Suffered Injury and Damages**

65. Plaintiff and Class members suffered present injuries when unauthorized criminal actors acquired control of their Private Information, including the loss of privacy, confidentiality,

---

[24] Secure Technology Alliance, Medical Identity Theft in Healthcare (Mar. 2010), https://www.securetechalliance.org/publications-medical-identity-theft-in-healthcare/ (last visited Sep. 2, 2026).

[25] U.S. Government Accountability Office, HHS Needs to Improve Communications for Breach Reporting, GAO-22-105111, at 5–6 (June 2022), https://www.gao.gov/assets/gao-22-105111.pdf.

[26] U.S. Government Accountability Office, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737, at 29–30 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf (last visited Sep. 2, 2026).

and exclusive control over information entrusted for limited healthcare and payment purposes. This was not an accidental exposure or a case in which data merely may have been accessible: Genesis and Anubis separately claimed that they hacked Interim and stole data. The criminal acquisition itself is an unauthorized disclosure and creates a substantial and imminent risk of misuse traceable to the Data Breach.

66. Plaintiff and Class members must devote time and resources to reviewing medical and insurance statements, financial accounts, credit reports, explanation-of-benefits records, and communications for misuse; changing credentials; securing accounts; responding to phishing; and correcting fraudulent or inaccurate records once misuse occurs.

67. The cost and burden of identity theft are substantial. The U.S. Department of Justice's Bureau of Justice Statistics reported that approximately 23.9 million people experienced identity theft in 2021; 59% suffered financial losses of at least $1, totaling $16.4 billion. Victims sustained an average direct loss of $880, victims of new-account misuse sustained an average direct loss of $3,430, and 10% of victims reported severe distress.[27]

68. Plaintiff's economic damages include overpayment and loss of the benefit of her bargain. She paid or caused payment for healthcare and related services that included an express or implied data-security component, but received services worth less because Interim allegedly did not provide reasonable security and confidentiality. Class members suffered the same measure of loss where they paid or caused payment for services subject to the same security practices.

69. The overpayment and benefit-of-the-bargain loss may be measured by the

[27] Erika Harrell & Alexandra Thompson, U.S. Department of Justice, Bureau of Justice Statistics, Victims of Identity Theft, 2021, NCJ 306474 (Oct. 2023), https://bjs.ojp.gov/library/publications/victims-identity-theft-2021 (last visited Sep. 2, 2026).

difference between the value of services with the reasonable security promised or reasonably expected and the value of the less-secure services actually received. A portion of payments generated within the network funded royalties and a technology fee specifically covering cybersecurity and central technology, but Plaintiff and Class members allegedly did not receive the data-security benefit funded by those charges.

70. Plaintiff and Class members also suffered a present loss of privacy, confidentiality, and exclusive control over their Private Information, which can no longer be represented as confidential, uncompromised, or known only to authorized persons.

71. Plaintiff and Class members seek actual damages for the injuries already sustained, including overpayment and lost benefit of the bargain and, where actually incurred and proven, the value of reasonable time spent and out-of-pocket costs incurred to monitor, protect, and correct their accounts and records, as well as direct economic losses caused by fraudulent misuse. They also face a substantial and continuing risk of identity theft, medical-identity theft, insurance fraud, financial fraud, phishing, credential attacks, and other misuse. That continuing risk supports the reasonableness of monitoring and the need for prospective relief.

72. These injuries are ongoing because Interim continues to retain Private Information, has not disclosed the full scope and duration of the compromise, and has not established that every access path was eradicated, that every acquired copy has been recovered or destroyed, or that reasonable safeguards now protect the information it retains. Plaintiff and Class members therefore seek prospective relief requiring Interim to assess and remediate vulnerabilities; implement appropriate access controls, multifactor authentication, segmentation, encryption, logging, monitoring, data minimization, vendor oversight, incident response, and

independent security testing; provide any notice required by applicable law; and provide appropriate identity-protection services.

**CLASS ACTION ALLEGATIONS:**

73. Plaintiff brings this action under Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of the following Nationwide Class:

> **All persons in the United States whose Private Information was accessed and acquired by unauthorized persons in the August 2026 Data Breach affecting Interim HealthCare Inc. and/or its headquarters systems.**

74. Excluded from the Class are Interim; its parents, subsidiaries, affiliates, officers, directors, and legal representatives; the judicial officers assigned to this case and their staff; and any person who timely and validly requests exclusion from a Rule 23(b)(3) Class.

75. *Numerosity*. The Class is so numerous that joinder is impracticable. Interim represents that its network cares for approximately 190,000 patients each year, and Anubis claims possession of 335,093 headquarters files. The exact number and identities of Class members are ascertainable from Interim's records, the affected systems, access logs, forensic artifacts, and files identified in the incident investigation.

76. *Commonality*. Common questions of law and fact include:

a) whether unauthorized persons accessed and acquired Private Information from Interim's systems;

b) the dates, duration, methods, systems, accounts, and data involved in the Data Breach;

c) whether the Genesis and Anubis postings arose from related, successive, shared, or separate unauthorized access;

d) whether Interim used reasonable administrative, physical, and technical safeguards;

e) whether Interim complied with its privacy promises, contracts, and confidentiality obligations;

f) whether Class members suffered common privacy, benefit-of-the-bargain, overpayment, and monitoring injuries; and

g) the scope and status of Interim's investigation, containment, remediation, and any notice required by law; and

h) the nature and scope of declaratory, injunctive, statutory, restitutionary, and damages relief.

77. *Typicality.* Plaintiff's claims are typical because she entrusted Private Information through the same Interim network, her information was subject to the same centralized access and security practices, it was compromised through the same Data Breach, and she suffered the same types of injury as other Class members.

78. *Adequacy.* Plaintiff will fairly and adequately protect the Classes. Her interests are aligned with the Classes, she has no disabling conflict, and she has retained counsel experienced in complex consumer, privacy, cybersecurity, and class litigation.

79. *Predominance.* Common questions predominate because the claims arise from Interim's uniform course of conduct, centralized systems and security program, common intrusion and response, standardized privacy representations, and duties imposed by generally applicable law. Liability can be proven with common evidence, including policies, architecture, forensic findings, logs, vendor records, access controls, incident-response materials, and the affected dataset.

80. *Superiority*. A class action is superior because individual damages are modest relative to the expense of cybersecurity discovery and expert proof; Class members lack practical access to forensic evidence; individual actions risk inconsistent results; and one proceeding will conserve judicial and party resources.

81. *Rule 23(b)(2).* Interim has acted or refused to act on grounds generally applicable to the Classes by using common security, access, retention, incident-response, and notice practices. Final declaratory and injunctive relief addressing those practices is therefore appropriate respecting the Classes as a whole.

82. *Ascertainability.* The Classes are defined by objective criteria and can be identified through Interim's patient, client, employee, applicant, insurance, billing, system-access, forensic, and notification records.

**CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE (INCLUDING NEGLIGENCE PER SE AS AN ALTERNATIVE THEORY)**
**(On Behalf of Plaintiff and the Nationwide Class)**

83. Plaintiff incorporates by reference paragraphs 1-82, as though fully set forth herein.

84. Interim owed Plaintiff and Class members a duty to exercise reasonable care in collecting, maintaining, accessing, transmitting, using, disclosing, and safeguarding their Private Information.

85. That duty arose independently of any contract. Interim required patients to provide Private Information to receive healthcare services; collected, accessed, controlled, and used that information for its own operational and commercial purposes; determined how and where the information would be maintained; and exercised control over the systems, networks,

vendors, security practices, and personnel responsible for protecting it.

86. Interim's centralized role placed it in the best position to protect the Private Information maintained within its network. Plaintiff and Class members could not control Interim's security practices, monitor its systems, install appropriate safeguards, limit access privileges, identify intrusions, or prevent unauthorized persons from acquiring their information.

87. Interim knew or reasonably should have known that the Private Information it maintained was highly sensitive and valuable to criminals. Interim also knew that healthcare organizations are frequent targets of ransomware and data-extortion attacks because their systems contain extensive collections of personal, financial, insurance, and medical information.

88. The likelihood of attempted unauthorized access was therefore reasonably foreseeable. The sensitivity of the information, the foreseeable consequences of its disclosure, and Interim's exclusive control over the relevant systems required Interim to employ security measures reasonably commensurate with the nature and volume of the information entrusted to it.

89. Interim further assumed a duty to protect Plaintiff's and Class members' Private Information by undertaking to provide and manage cloud infrastructure, cybersecurity, network services, electronic communications, information systems, and technical support for its franchise operations and by representing that it would maintain the privacy and security of information collected through those operations.

90. Interim's duties included exercising reasonable care in designing, selecting, configuring, maintaining, testing, and monitoring its information systems; authenticating users; limiting administrative and remote access; implementing multifactor authentication; segmenting networks; encrypting sensitive information; installing security updates; remediating known

vulnerabilities; maintaining appropriate logging and monitoring; and deploying effective endpoint, intrusion-detection, and data-loss-prevention controls.

91. Interim's duties also included collecting and retaining only the Private Information reasonably necessary for legitimate purposes; limiting the persons and systems permitted to access that information; periodically reviewing and terminating unnecessary access privileges; securely disposing of information no longer required; selecting and supervising competent vendors; training personnel to recognize and respond to security threats; maintaining secure and recoverable backups; and testing its incident-response procedures.

92. Upon discovering or receiving notice of suspicious activity, Interim had additional duties to investigate promptly, contain the intrusion, preserve relevant evidence, determine what information had been accessed or acquired, remediate the vulnerabilities that permitted the intrusion, prevent further disclosure, and provide affected individuals with timely and accurate notice sufficient to protect themselves from misuse.

93. The applicable standard of care is informed by, among other authorities and industry practices, Section 5 of the Federal Trade Commission Act and related FTC data-security guidance; the HIPAA Privacy, Security, and Breach Notification Rules; the NIST Cybersecurity Framework 2.0; CISA ransomware and cybersecurity guidance; Interim's privacy and security representations; and the healthcare-industry standards alleged above.

94. Interim breached its duties by failing to implement and maintain reasonable safeguards appropriate to the sensitivity and volume of the Private Information within its control. On information and belief, those failures included inadequate identity and access management, multifactor authentication, network segmentation, encryption, patch management, vulnerability remediation, endpoint protection, logging, monitoring, intrusion detection, data-loss prevention,

vendor oversight, employee training, data minimization, and incident-response controls.

95. Interim further breached its duties by maintaining Private Information in systems accessible from its broader network; permitting access beyond what was reasonably necessary; failing to detect or stop the unauthorized access before data was acquired; failing to prevent the exfiltration of a substantial quantity of files; and failing to implement safeguards sufficient to prevent criminals from obtaining patient and consumer information.

96. The facts supporting breach are specific. Interim selected or approved the operational and electronic medical-record systems used across its network; provided cloud infrastructure, cybersecurity, network data, email, intranet, and IT support; collected patient and hospice information and reserved unrestricted access to information generated in those systems. Despite that centralized control, in August 2026 Genesis and Anubis separately claimed that they had hacked Interim and stolen data, and Anubis identified Interim's headquarters and claimed possession of 530 gigabytes comprising 335,093 hospice files.

97. Plaintiff received healthcare services through an Interim provider and supplied identifying, health, treatment, insurance, billing, and payment information to obtain and pay for those services. On information and belief, her records were created, maintained, transmitted, reported, or accessible through the approved systems that Interim controlled or could access and were among the files acquired in the Data Breach.

98. Interim's failures directly and proximately caused the Data Breach. Had Interim implemented reasonable and readily available safeguards, the unauthorized access would have been prevented, detected sooner, or substantially limited, and Plaintiff's and Class members' Private Information would not have been acquired by unauthorized persons.

99. Criminal attempts to obtain sensitive healthcare information were foreseeable, and

protecting that information against such attempts was the very purpose of the duties Interim breached.

100. As a direct and proximate result of Interim's negligence, Plaintiff and Class members suffered an unauthorized loss of privacy, confidentiality, and control over their Private Information; overpayment and loss of the benefit of their bargain for services that should have included reasonable data security; and, where actually incurred and proven, the value of reasonable monitoring and mitigation time, out-of-pocket costs, and direct economic losses caused by misuse or corrective measures. The continuing risk of identity theft, medical-identity theft, insurance fraud, financial fraud, phishing, and other misuse supports reasonable monitoring and prospective relief.

101. Plaintiff and Class members are entitled to recover compensatory, consequential, and other damages allowed by law, together with appropriate declaratory and equitable relief.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Nationwide Class)**

102. Plaintiff incorporates by reference paragraphs 1-82, as though fully set forth herein.

103. When Plaintiff and Class members sought or received healthcare, hospice, personal-care, staffing, employment, or related services within the Interim network, they provided Private Information and monetary or other consideration. Interim accepted, accessed, used, and benefited from that information and consideration.

104. The parties' course of dealing created an implied contract that Interim would use the Private Information only for authorized purposes, maintain its confidentiality, employ

reasonable security, comply with applicable law and its privacy representations, and promptly notify affected persons of a compromise.

105. Interim's Notice of Privacy Practices memorializes these implied terms, including the promises to maintain the privacy and security of PHI, limit disclosures, and notify affected persons promptly after a breach.

106. Plaintiff and Class members performed by providing Private Information, authorizing its limited use, receiving services, and paying or causing payment for those services.

107. Interim breached the implied contracts by failing to use reasonable security, permitting unauthorized access and acquisition, and disclosing Private Information to criminal actors.

108. The facts supporting that breach include the August 2026 claims by Genesis and Anubis that they had hacked Interim and stolen data, Anubis's identification of Interim's headquarters, and its claimed possession of 530 gigabytes comprising 335,093 hospice files. On information and belief, Plaintiff's Private Information was maintained in or accessible through Interim-approved systems and was among the information acquired without authorization.

109. Reasonable data security and confidentiality were material terms. Plaintiff and Class members would not have provided the same information or paid the same price had Interim disclosed that it would not provide the promised protections.

110. As a direct result, Plaintiff and Class members suffered the injuries alleged above and are entitled to expectation, benefit-of-the-bargain, consequential, nominal, and other contract damages.

**COUNT III**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiff and the Nationwide Class)**

111. Plaintiff incorporates by reference paragraphs 1-82, as though fully set forth herein.

112. Healthcare information is disclosed in confidence. Interim knew that Plaintiff and Class members furnished their Private Information for the limited purposes of obtaining care, processing payment, employment, staffing, compliance, and related authorized operations.

113. Plaintiff disclosed her health, treatment, insurance, billing, payment, and identifying information while obtaining healthcare through an Interim provider. Those disclosures were made for healthcare and payment purposes, not for access, acquisition, extortion, or publication by criminal actors.

114. Interim accepted the information, represented that it would remain private and secure, and reserved unlimited access to approved systems containing the information. Those circumstances created a confidential relationship and a common-law duty not to disclose the information to unauthorized persons.

115. Interim breached the confidential relationship by failing to safeguard the information and by causing or permitting its disclosure to criminal actors for purposes outside the confidence.

116. The August 2026 Genesis and Anubis postings, including Anubis's identification of Interim's headquarters and its claimed possession of 530 gigabytes comprising 335,093 hospice files, are the specific facts supporting unauthorized acquisition and disclosure.

117. The disclosure was not consented to, privileged, required for treatment or payment, or otherwise authorized by law.

118. As a direct result, Plaintiff and Class members suffered loss of confidentiality and privacy, economic loss, and the other injuries alleged above, for which they seek damages and equitable relief.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class; Restitution Sought; Pleaded in the Alternative)**

119. Plaintiff incorporates by reference paragraphs 1-82, as though fully set forth herein.

120. Plaintiff and Class members conferred benefits on Interim by providing valuable Private Information, participating in the Interim network, and paying or causing payment for services that generated royalties, technology fees, revenue, and enterprise value for Interim.

121. Plaintiff paid or caused payment for healthcare services from Defendant and provided Private Information required for those services. Interim received royalties, technology fees, and other enterprise benefits from those transactions while failing to provide the security and confidentiality for which the payments and information were furnished.

122. Interim knew of and accepted those benefits. It retained Private Information for its own reporting, operational, regulatory, marketing, franchise, and commercial purposes and charged franchisees for a technology program that expressly included cybersecurity.

123. Interim saved the costs it should have incurred to provide reasonable security, while retaining the money and value obtained on the premise that the information would remain private and secure.

124. It would be inequitable for Interim to retain the portion of payments, fees, savings, and data value attributable to security and confidentiality that it failed to provide.

125. Plaintiff and Class members are entitled to restitution, disgorgement, and imposition of a constructive trust over the benefits unjustly retained, pleaded in the alternative to their contract claim.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the proposed Classes, respectfully requests that the Court enter judgment in her favor and against Interim as follows:

126. Certifying the Nationwide Class under Rules 23(b)(2) and 23(b)(3), appointing Plaintiff as Class representative, and appointing her counsel as Class counsel;

127. Declaring that Interim's acts and omissions violated the legal duties and rights alleged in this Complaint;

128. Awarding the declaratory and injunctive relief described above;

129. Awarding actual, compensatory, consequential, nominal, statutory, and enhanced damages in amounts to be determined at trial and as permitted by law;

130. Awarding restitution, disgorgement, and other equitable monetary relief;

131. Awarding pre- and post-judgment interest;

132. Awarding reasonable attorneys' fees, litigation expenses, and taxable costs as permitted by law; and

133. Granting such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: September 2, 2026

Respectfully submitted,

*/s/ Jeff Ostrow*
Jeff Ostrow (FBN 121452)

Andrew Hausdorff (FBN 1068481)
**KOPELOWITZ OSTROW P.A.**
One W Las Olas Blvd, suite 500
Fort Lauderdale, FL 33301
Tel: (954) 332-4200
ostrow@kolaywers.com
hausdorff@kolawyers.com